OPINION
{¶ 1} The State of Ohio appeals a judgment of the Montgomery County Common Pleas Court granting the defendant, Sarah M. Aufrance's motion to suppress evidence. The State asserts that the trial court improperly granted Aufrance's motion to suppress because the evidence was not seized as the result of an illegal stop as found by the trial court. Finding that Aufrance's initial stop was legal, we must reverse the trial court and remand the cause for further proceedings.
 {¶ 2} In the early morning hours of May 17, 2006, Officer Robert Orndorff of the Dayton Police Department was routinely patrolling the area of the 2100 block of North Main Street. Orndorff, being aware that this was a high crime area frequented by prostitutes and drug dealers, observed Aufrance walking in a dark alley rather than on the lighted street. Orndorff exited his cruiser and approached Aufrance, asking her where she was going. Aufrance replied that she was out for a walk because she had been in a fight with her boyfriend.
 {¶ 3} At that point, the evidence is conflicting as to whether Orndorff asked Aufrance her name and social security number, which she gave him, prior to or after his modified pat-down search of Aufrance for weapons. At the suppression hearing, Orndorff justified the pat-down search on the basis that he had recovered numerous weapons from persons in that area over his years of police experience. Orndorff did not express any particular reason to believe that Aufrance might be armed, or that she was committing or about to commit a crime. The pat-down search did not reveal any weapon or any other evidence.
 {¶ 4} At about that time, another officer arrived on the scene, and Orndorff gave him the name and social security number of Aufrance. The other officer *Page 3 
immediately did a computer check on the name and social security number and reported that she had an active arrest warrant for loitering to solicit prostitution. Orndorff then placed Aufrance under arrest on the warrant and placed her in the rear of his cruiser.
 {¶ 5} Orndorff transported Aufrance to the Montgomery County Jail where a thorough search of Aufrance was conducted. This search resulted in the discovery of a small amount of crack cocaine. Aufrance was indicted in the within case for possession of the crack cocaine that was discovered in the search at the county jail.
 {¶ 6} After pleading not guilty to the charge, Aufrance filed a motion to suppress, which was granted by the trial court.
 {¶ 7} The State appeals the judgment of the trial court, pursuant to Crim.R. 12(K), setting forth a single assignment of error: the trial court erred in suppressing the evidence.
 {¶ 8} The standard of review regarding motions to suppress is whether the trial court's findings are supported by competent, credible evidence. State v. Vance (1994), 98 Ohio App.3d 56, 58-59,647 N.E.2d 851; State v. Ferguson (Apr. 18, 2002), Defiance App. No. 4-01-34,2002 WL 596 115, at *2. "At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact."State v. Mills (1992), 62 Ohio St.3d 357, 366, 582 N.Ed2d 972. However, an appellate court makes an independent determination of the law as applied to the facts. Vance, 98 Ohio App.3d at 59.
 {¶ 9} The state argues that the initial conversation with Aufrance, where she gave the officer her name and social security number, was not a detention, and that *Page 4 
her subsequent arrest on the outstanding warrant was the result of this casual encounter. While the state concedes that the weapons pat down did constitute a detention, it argues that when the search revealed no weapon, the detention was over, and the casual encounter continued thereafter until her name and social security number had been run through the computer. The State points out that the subsequent search that Aufrance is seeking to suppress resulted from the arrest on the warrant, which occurred as the result of the casual encounter, and not as the result of the concededly illegal detention for the weapons pat down.
 {¶ 10} Aufrance, citing State v. Cook, Montgomery App. No. 20427,2004-Ohio-4793, argues that the illegal pat-down search amounted to a show of authority sufficient to cause her to believe that she was still under detention, and that the information leading to her subsequent arrest was obtained during this continued period of illegal detention. The trial court did not make this finding; instead, it found that the initial encounter was violative of the Fourth Amendment.
 {¶ 11} The trial court, upon viewing the uncontroverted facts, in a thorough and well written opinion, made a finding that the initial stop of Aufrance was illegal, by applying the law pertinent to an investigative stop pursuant to Terry v. Ohio (1968), 392 U.S. 1,88 S.Ct. 1868, 20 L.Ed.2d 889, and this court's holding in State v.White (Jan. 18, 2002), Montgomery App. No. 18731, 2002 WL 63294. After finding that the initial stop was illegal, the trial court applied this court's authority from State v. Jamison (May 11, 2001), Montgomery App. No. 18453, 2001 WL 501942, and State v. Ford (2002),149 Ohio App.3d 676, 2002-Ohio-5529, 778 N.E.2d 642 and concluded that the identity of Aufrance was the result of an unlawful stop, and *Page 5 
that it must therefore be suppressed.
 {¶ 12} Contact between police officers and the public can be characterized in different ways. The first manner of contact and the least restrictive is contact that is initiated by a police officer for purposes of inquiry only. "[M]erely approaching an individual on the street or in another public place[,]" asking questions for voluntary, uncoerced responses, does not violate the Fourth Amendment. UnitedStates v. Flowers (C.A. 6, 1990), 909 F.2d 145, 147. The United States Supreme Court has repeatedly held that mere police questioning does not constitute a seizure for Fourth Amendment purposes. Florida v.Bostick (1991), 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389;INS v. Delgado (1984), 466 U.S. 210, 212, 104 S.Ct. 1758,80 L.Ed.2d 247. "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; * * *, provided they do not convey a message that compliance with their request is required."Bostick, 501 U.S. at 434-35 (citations omitted). A person approached in this fashion need not answer any questions, and may continue on his or her way unfettered by any real or implied restraint, and he may not be detained even momentarily for his refusal to listen or answer. Id.
 {¶ 13} This district specifically, and Ohio in general, have recognized this principle as well, in varying contexts, that a police encounter with an individual can be casual and consensual and thereby not violative of the Fourth Amendment. See, e.g., State v. Osborne (Dec. 13, 1995), Montgomery App. No. CA 15151, 1995 WL 737913; State v.Welz (Dec. 9, 1994), Lake App. No. 93-L-137, 1994 WL 721846;Cuyahoga Falls v. Sandstrom (June 21, 1995), Summit App. No. 17000, *Page 6 
1995 WL 366486; State v. Kiggans (Nov. 20, 1995), Stark App. No. 1995CA00157,1995 WL 768597; State v. Adams, Lake App. No. 2003-L-014,2004-Ohio-3852.
 {¶ 14} A more intrusive kind of contact is referred to as a "Terry stop." This stop constitutes a temporary detention of the individual, and it must be predicated upon a reasonable articulable suspicion. This type of detention constitutes a seizure, but it does not violate the Fourth Amendment "* * * if there is articulable suspicion that a person has committed or is about to commit a crime." Florida v. Royer (1983),460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229.
 {¶ 15} In reviewing the evidence, we note that the only witness to testify as to the encounter between Officer Orndorff and Ms. Aufrance was the officer himself. His testimony, however, is conflicting as to the crucial issue needed to determine this matter. It is uncontroverted that the encounter between him and Aufrance was a casual and consensual encounter, not implicating any Fourth Amendment issues until the time that he initiated the modified pat-down search of her. Orndorff testified upon direct examination that he obtained her name and social security number during this initial encounter and before the pat-down search. However, he testified on cross-examination that her name and social security number were not obtained until after the pat-down search.
 {¶ 16} On direct examination, the following was elicited from Office Orndorff:
 {¶ 17} "Q. What happened when you saw the defendant?
 {¶ 18} "A. I exited my cruiser and approached her to speak to her.
 {¶ 19} "Q. All right. And describe what happened as you approached her.
 {¶ 20} "A. I basically asked her where she was headed. *Page 7 
 {¶ 21} "Q. And did she respond?
 {¶ 22} "A. Yes.
 {¶ 23} "Q. And what did she tell you?
 {¶ 24} "A. She said that she and her boyfriend had gotten into a fight and she was taking a walk.
 {¶ 25} "Q. All right. What did you do at this point?
 {¶ 26} "A. I mean, again, I asked her her name and obtained her social security number.
 {¶ 27} "Q. Did she comply with that information request?
 {¶ 28} "A. Yes.
 {¶ 29} "Q. And did she tell you her name was Sarah Aufrance?
 {¶ 30} "A. Yes.
 {¶ 31} "Q. Did she give you her correct social security number?
 {¶ 32} "A. Yes, she gave me — at the time I didn't know.
 {¶ 33} "Q. A social security number?
 {¶ 34} "A. Yes.
 {¶ 35} "Q. Okay. What happened at that point?
 {¶ 36} "A. I then asked to or actually conducted a patdown." (Tr. at 7-8.)
 {¶ 37} On cross-examination, however, Orndorff testified differently as to the order in which the events transpired:
 {¶ 38} "Q. It [the police report filed by Orndorff] says you made contact with the defendant walking in the alley, exited the cruiser, yada, yada, and asked her *Page 8 
what she was doing in the alley.
 {¶ 39} "A. Yes.
 {¶ 40} "Q. And that was the first thing you said to her?
 {¶ 41} "A. Yes.
 {¶ 42} "Q. It says then that the next thing you did, and I quote, `Due to the area, a patdown of her outer clothing was conducted.' Is that correct?
 {¶ 43} "A. Yes, a patdown was conducted, yes." (Tr. At 14-15.)
 {¶ 44} "Q. Okay. And then you asked — and then I believe it says Officer Price arrived, and it says the defendant's information was obtained. And I'm asking these questions based upon just the position of those two sentences.
 {¶ 45} "Who secured the information from my client, you or Officer Price?
 {¶ 46} "A. I did.
 {¶ 47} "Q. Okay. And that was after the patdown.
 {¶ 48} "A. Yes.
 {¶ 49} "Q. And that was — did you secure a picture ID, a state ID?
 {¶ 50} "A. She didn't have identification on her.
 {¶ 51} "Q. Okay. And how did you ascertain that? How did you find that out?
 {¶ 52} "A. She said she didn't have an ID.
 {¶ 53} "Q. Okay. Because you asked her for one?
 {¶ 54} "A. Yes. *Page 9 
 {¶ 55} "Q. Okay. And that was after the patdown?
 {¶ 56} "A. Yes, I do believe." (Tr. At 17.)
 {¶ 57} Because the initial stop of Aufrance was not violative of the Fourth Amendment, and if that the information, i.e. her name and social security number, that allowed the officer to discover that there was an active warrant for her arrest, was obtained prior to the pat-down search, then the evidence would have been obtained legally.
 {¶ 58} The inquiry now moves to the issue of the effect of the pat-down search of Aufrance. Again, even the state concedes that this action by the officer was illegal. Officer Orndorff testified as to no reasonable, articulable suspicion that Aufrance was either engaged in or about to engage in illegal activity nor that she was armed at the time he conducted his pat-down search. Clearly, anything obtained as the result of this search must be suppressed. The state contends that after this was completed, and nothing was found, the status of the parties returned to a casual, consensual encounter until the computer check of Aufrance's identity turned up the active warrant and she was arrested. The defendant argues that the elevation of the encounter to an illegal seizure taints the process, and that the identification information was not legally obtained. Therefore, the defendant argues that suppression is mandated.
 {¶ 59} The trial court, in its opinion, discussed a long list of cases from this district that evidences an extraordinary effort to properly apply that law. This discussion starts with Dayton v. Click (Oct 5, 1994), Montgomery App. No. 14328, 1994 WL 543210, proceeds throughState v. Lynch (June 6, 1998), Montgomery *Page 10 
App. No. 17028, 1998 WL 288936, and concludes with State v.Jamison, supra, and State v. Ford, supra. The trial court concluded thatFord was binding authority, and on that basis, it granted the motion to suppress.
 {¶ 60} The Ford and Jamison decisions that the trial court cited are based upon a common fact pattern. In both Ford and Jamison, the arrest of the defendant on the outstanding warrant resulted after the officer obtained the identity of the defendant as the result of an illegal search. Here, because the evidence is contradictory, and because the trial court made no finding as to when her name and identity were obtained, we cannot apply Ford and Jamison, as a matter of law, to the fact pattern with which we are presented.
 {¶ 61} If the discovery of the identity of Aufrance was the result of a legal casual encounter, then the evidence would not be suppressed; however, if the discovery of her identity came after the illegal pat-down search, then the evidence, as in Ford and Jamison, must be suppressed.
 {¶ 62} The exclusionary rule will only be applied to evidence that was obtained through a violation of constitutional rights. Kettering v.Hollen (1980), 64 Ohio St.2d 232, 416 N.E.2d 598. The purpose of the exclusionary rule is to deter unlawful police conduct by prohibiting the state from benefitting from conduct when it is in violation of the Fourth Amendment.
 {¶ 63} If the events transpired in the order testified to by Orndorff on direct examination, then the obtaining of her name and social security number would be the product of the legal casual encounter, and the subsequent search that found the drugs would have been proper. If, however, the events transpired in the order *Page 11 
testified to by Orndorff on cross examination, then the obtaining of her name and social security number was the product of an illegal search, and everything thereafter must be suppressed. Because "[a]t a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact[,]" we must remand this matter for this factual determination by the trial court.Mills, 62 Ohio St.3d at 366. After this factual determination, the trial court should proceed to judgment on the suppression issue consistent with this opinion.
 {¶ 64} For the foregoing reasons, the judgment of the Montgomery County Common Pleas Court is hereby reversed, and the cause is remanded to the trial court for further proceedings consistent herewith.
WOLFF, P.J., and FAIN, J., concur.
(Hon. Sumner E. Walters, retired from the Third Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio). *Page 1