[Cite as *State v. Hood*, 2015-Ohio-102.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 101200**

**STATE OF OHIO**

PLAINTIFF-APPELLANT

vs.

**JEFFREY A. HOOD**, **JR.**

DEFENDANT-APPELLEE

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-575603-A

**BEFORE:** Stewart, J., Jones, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** January 15, 2015

**ATTORNEYS FOR APPELLANT**

Timothy J. McGinty
Cuyahoga County Prosecutor

By:   Adam Chaloupka
Stephanie Hall
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH   44113


**ATTORNEYS FOR APPELLEE**

Robert L. Tobik
Chief Public Defender

By: Erika B. Cunliffe
Assistant Public Defender
Joseph V. Libretti
Legal Intern/Law Clerk
Cuyahoga County Public Defender
310 West Lakeside, Suite 200
Cleveland, OH   44113

MELODY J. STEWART, J.:

{¶1} The state of Ohio appeals the order of the Cuyahoga County Court of Common Pleas granting defendant-appellee Jeffery A. Hood, Jr.'s motion to suppress. We affirm the trial court's decision.

{¶2} On July 22, 2013, the Cuyahoga County Grand Jury indicted Hood on charges of carrying a concealed weapon in violation of R.C. 2923.12(A)(2) and having a weapon while under disability in violation of R.C. 2923.13(A)(2). The charges stemmed from a pat-down search of Hood during a police encounter with Hood and a group of others on a street in the city of Cleveland. The search resulted in the police recovering from Hood a firearm and a single round of ammunition. Hood filed a motion to suppress the weapon and the ammunition, arguing that the evidence was discovered and seized as a result of an illegal Fourth Amendment search. The trial court agreed and granted the motion. The state appeals, arguing that the court erred in granting the motion because the evidence was discovered as a result of a consensual police encounter.

{¶3} According to testimony presented at the suppression hearing, on the evening of June 19, 2013, nine Cleveland police detectives in the gang impact unit's Violent Gun Reduction Initiative Program 7 ("VGRIP7")[1] were patrolling the area of East 102nd Street and Dove Avenue in the city of Cleveland. Sergeant Ali Pillow was the supervisor in charge of the VGRIP7. On this night, Pillow and his other detectives were patrolling the area in unmarked

---

[1] The Violent Gun Reduction Initiative Program ("VGRIP") is a program designed to investigate and analyze the source of violent gun crimes in areas and neighborhoods in the city of Cleveland that have high reports of gun violence, violent crime, and gang activity. The area surrounding East 102nd Street and Dove Avenue had, at the time of the encounter, been targeted as an area that experiences a high volume of violent crime, including gun crime related to gang activity. The detectives of VGRIP7 were assigned to patrol this area.

police cars in a convoy-like procession. All of the detectives were wearing civilian clothes with outer clothing indicating that they were police. The detectives also wore visible police badges, and all of the officers were visibly carrying firearms, Tasers, pepper spray, and handcuffs.

{¶4} At around 8:30 p.m., while patrolling westbound on Dove Avenue near the corner of East 102nd Street, Pillow observed a male wearing what he recalled to be a T-shirt with a design on it that said D-Block and Dove Love. Pillow was aware of neighborhood gangs associated with the names D-Block and Dove Boyz. The man wearing the T-shirt would later be identified as Randolph Byarse.

{¶5} Pillow believed that Byarse's T-shirt may have been a "rest in peace" shirt indicating that someone in the neighborhood had been killed. This shirt was of particular significance to Pillow because he was also aware of a recent, potentially gang-related murder that had occurred in the neighborhood. Based on this knowledge, Pillow ordered the officer driving to stop so that Pillow could get out and talk to Byarse. Pillow testified that it was routine for VGRIP7 detectives to investigate gangs by interacting with members of the community who might have information about gang-related activity.

{¶6} When Pillow first saw Byarse, Byarse was standing a couple feet away from a group of five or six people, some of whom were sitting inside, or standing outside and leaning against, a Chevy Malibu. The Malibu was parked on East 102nd Street. Hood was one of the individuals standing outside of the Malibu.

{¶7} When Pillow's car stopped, the other three patrol cars followed suit. Pillow testified that one of the police cars parked immediately in front of the Malibu, one car parked next to and toward the left rear of the vehicle, the third car parked behind it, and his car, being the last in the procession, parked behind the police car that was immediately behind the Malibu.

Directly to the right of the vehicle was a grassy area and a guardrail. Pillow testified that he did not believe that the Malibu was blocked in at any time but did admit that the entire scene may have seemed dramatic to those individuals in the group. Pillow testified that as the four police vehicles pulled up to the Malibu and stopped, neither he, nor any of the other officers, had any reason to suspect that Hood, Byarse, or any of the other individuals in the group were engaged in criminal activity.

{¶8} Pillow testified that he exited his vehicle and began walking toward Byarse. At the same time, the other eight officers also exited their vehicles and began approaching the individuals, surrounding the Malibu. At this point, according to Pillow, Byarse immediately put his hands up and said that he had a "CCW." Pillow explained that his understanding of the acronym is that it stands for "carrying a concealed weapon." Both Hood and the state agree that Byarse did not explicitly say that he had a permit to carry a concealed weapon, but it became evident during the stop that Byarse was attempting to inform the police, in compliance with R.C. 2923.12(B)(1) and (2) — the conceal carry statute — that he was lawfully carrying a concealed weapon. Due to the confusion, however, and Pillow's concern for officer safety, Pillow drew his weapon and ordered Byarse and the other individuals in the group, including Hood, to put their hands up.

{¶9} During the detention, Pillow focused on Byarse while the detectives interacted with the other members of the group. Pillow proceeded to pat-down Byarse and found a weapon in his waistband. After further investigation, the detectives were able to confirm that Byarse did have a permit to carry a concealed weapon.

{¶10} At the same time that Pillow was patting down Byarse and running a permit check, Detective Wilfredo Diaz started to approach Hood. Diaz testified that it is routine in detention

situations involving multiple subjects for each officer to take a different individual and interact with him or her. According to Diaz, Hood acted nervous and was continually looking back at him as he approached Hood. Diaz also testified that Hood's hands were initially raised above his head, but kept lowering as Diaz approached. According to Diaz, Hood lowered his hands toward his waistband in a motion that appeared as though Hood was trying to conceal or get rid of an object. Because of these movements and his concern for officer safety, Diaz frisked Hood for weapons. Diaz testified that he never drew his gun; however, another detective did draw his gun on Hood. Diaz recovered a .45 caliber firearm from a holster under Hood's shirt as well as a round of ammunition from Hood's pocket. The detectives arrested Hood once they discovered he did not have a permit to carry a concealed weapon and that he was under a weapons disability.

{¶11} The court also heard from the state's witness, Brittany Cooper. Cooper was the driver of the Malibu. She testified that she was seated in the driver's seat when the police surrounded the car. She also testified that while she was not sure at what point the officers drew their guns, all of the officers exited their cars at the same time and it was apparent to her that they were police officers.

{¶12} Byarse and Denise Hill testified for the defense. Hill had also been standing around the Malibu. Both Byarse and Hill testified that the police vehicles surrounded the Malibu, blocking it in, and that all of the officers exited their vehicles at the same time. Byarse testified that as Pillow approached him, Pillow had his gun drawn and pointed towards him. Byarse also testified that Pillow was shouting at him to put his hands up prior to Byarse stating that he had a CCW. Hill also testified that as the police exited their vehicles, and before Byarse attempted to inform the police that he had a CCW permit, the officers already had their guns drawn.

{¶13} At the close of the hearing, the court acknowledged that there were inconsistencies between the defense's version of the events that evening and the state's version; however, the court found that the police intended to keep the encounter with the group consensual and not coercive. The court believed the police's intention that evening was to gather intelligence related to gang activity. The court found that the officers initiated the interaction with the group by surrounding the Malibu with their vehicles. The court further found that at the time the police initiated the interaction, they had no reasonable suspicion that any of the individuals were committing a crime or about to commit a crime.

{¶14} The court found that based on these facts, a reasonable person in Hood's position would not have felt free to leave once the police arrived. The court stated that surrounding a group of individuals with four police cars, while nine officers exited the vehicles and approached the group, amounted to a show of force. The court stated, "I would be hard-pressed to accept the view that under those circumstances anyone felt that they could just walk away."

{¶15} While both defense witnesses testified that as the police approached them the officers already had their guns drawn, the court resolved this question of fact in favor of the state. The court went on to say that, "[n]evertheless, * * * whether or not [the detectives] all jumped out with their guns drawn, the coercive effect of surrounding these young people under the circumstances did, in my view amount to a seizure." For these reasons, the court suppressed the evidence.

{¶16} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. The trial court assumes the role of the trier of fact when presented with a motion to suppress. *Id.* Therefore, the trial court is in the best position to analyze the evidence and evaluate the

credibility of the witnesses. *Id.* Accordingly, an appellate court must defer to the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* However, an appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the facts meet the applicable legal standard. *State v. Hill,* 8th Dist. Cuyahoga Nos. 83762 and 83775, 2005-Ohio-3155, ¶ 12.

{¶17} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio State Constitution protect against unreasonable governmental searches and seizures. *State v. Callan*, 8th Dist. Cuyahoga No. 95310, 2011-Ohio-2279, ¶ 15. Warrantless searches and seizures are considered per se unreasonable, unless an exception to the warrant requirement applies. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One exception to the warrant requirement is the consensual encounter. *See State v. Boswell*, 5th Dist. Ashland No. 13-COA-018, 2014-Ohio-886, ¶ 14. This is a manner of contact initiated by a police officer for purposes of inquiry only. "[M]erely approaching an individual on the street or in another public place[,]" for the purpose of asking questions that elicit voluntary, uncoerced responses, does not violate the Fourth Amendment. *Id.,* citing *United States v. Flowers*, 909 F.2d 145, 147 (6th Cir.1990). A person approached in this way is not required to answer any questions, and may choose to end the interaction at any point or decline to engage in the interaction altogether. *See Boswell* at ¶ 11.

{¶18} Another exception to the warrant requirement is the brief investigatory stop, commonly referred to as a *Terry* stop. *Boswell* at ¶ 12. A *Terry* stop is a temporary detention of person for the limited purpose of either conducting a pat-down of the outer clothing of a person suspected of being armed and dangerous, or investigating suspected criminal behavior. *See Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). While a *Terry* stop

constitutes a seizure, it does not violate the Fourth Amendment as long as the officer has reasonable suspicion based on articulable facts that a person has committed or is about to commit a crime. *State v. Aufrance*, 2d Dist. Montgomery No. 21870, 2007-Ohio-2415*, ¶* 14, citing *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). If the officer temporarily detains a person without reasonable suspicion, then a Fourth Amendment violation has occurred. *See Aufrance* at ¶ 14. If evidence is obtained as a result of an illegal Fourth Amendment search or seizure, the exclusionary rule bars that evidence from being used against a defendant at trial. *Murray v. United States*, 487 U.S. 533, 536, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

{¶19} The trial court was called upon to decide whether the initial police action — that included four police vehicles and nine police officers encircling the group of individuals — was a consensual encounter for which no reasonable suspicion was necessary, or a *Terry* stop for which reasonable suspicion was needed.

{¶20} Under the Fourth Amendment, a person is considered seized when police use physical force or a show of authority sufficient enough to restrain a person's liberty. *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Whether a person's liberty has been restrained is viewed objectively. *See id.* at 554. The relevant inquiry is whether, when looking at the totality of the circumstances, a reasonable person under the same circumstances would feel free to leave and end the encounter with the police. *Id.* A person is not seized within the meaning of the Fourth Amendment if the police merely engage a person in a consensual encounter. *See id.* Therefore, the court ultimately had to decide whether a reasonable person, when faced with the same police interaction as Hood, would have felt free to leave and end the interaction.

{¶21} The court found that under the circumstances, a reasonable person would not have felt free to leave. We defer to the trial court's findings.

{¶22} Testimony presented at the suppression hearing showed that nine police detectives surrounded the group of individuals with their vehicles, exited the vehicles, then proceeded to walk toward the group. The trial court concluded that this amounted to a coercive show of force, removing the entire interaction from the realm of a consensual encounter and thus becoming a *Terry* stop for which reasonable suspicion of criminal activity was necessary. We find nothing in the record to rebut this conclusion.

{¶23} At the suppression hearing, Sergeant Pillow testified about the location of his unit's vehicles in relation to the Malibu. He stated that one police vehicle was parked in front of the Malibu, two were behind it, and one vehicle was stopped to the side rear of the Malibu. These statements were confirmed by the state and defense witnesses who testified at the suppression hearing. Further, Pillow and Diaz testified that most, if not all, of the other police detectives in the unit exited their vehicles and began walking toward the group of individuals with Pillow. Pillow testified that his unit's officers were all clad in bullet-proof vests that conspicuously said "police" on them, and that the officers had visible weapons, handcuffs, and other police tools. Furthermore, Pillow testified that the entire approach may have seemed "dramatic," and that the individuals seemed startled by the whole encounter. Most importantly, Pillow testified that at the time the unit pulled up to the Malibu, the officers had no reasonable suspicion that any member of the group was committing, or about to commit, a crime.

{¶24} The state attempts to argue that because the trial court found that the detectives did not have any intent to search or arrest the individuals, and because the trial court found that the police did not exit their unmarked vehicles with their guns drawn on Byarse, Hood, or the others

at the scene, that there was no coercive show of force by the police. This argument is not well taken.

{¶25} In making this argument, the state inherently supposes two incorrect propositions of law. The first is that the officers' intent is relevant to Fourth Amendment analysis, and the second is that an officers' show of force is solely dependent on the drawing of weapons.

{¶26} As to the first proposition, the officers' intent did not matter in this case, rather the proper inquiry, as the trial court found, is whether a reasonable person in Hood's position would have felt free to leave. Further, an officer does not have to draw his weapon for there to be a show of force sufficient to restrain a person's liberty. The United States Supreme Court in *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870, 64 L.Ed.2d 497, listed several examples of circumstances that tend to indicate when a police encounter is not consensual and a reasonable person would not feel free to leave, thus implicating the Fourth Amendment. In addition to displaying a weapon, examples include, among others, the threatening presence of several officers and the officer's wearing of a uniform. *Id.*

{¶27} Here, the circumstances meet all three of the above examples. Testimony revealed that nine officers simultaneously exited four police vehicles that surrounded a group of individuals, that those nine police officers began walking towards the group of individuals, and that all of those police officers were obviously carrying weapons and Tasers.

{¶28} This was not a consensual police encounter. Therefore, the police needed to show that they had a reasonable suspicion of criminal activity to justify the initial stop. Because the testimony at the suppression hearing revealed that the officers did not have reasonable suspicion for the stop, the evidence must have been excluded. The assignment of error is overruled.

{¶29} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MELODY J. STEWART, JUDGE

LARRY A. JONES, SR., P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR