[Cite as *State v. Dorroh*, 2021-Ohio-12.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 109158 |
| v. | : | |
| DERRICK DORROH, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED
**RELEASED AND JOURNALIZED:** January 7, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-639864-B

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Nora C. Bryan, Assistant Prosecuting Attorney, *for appellee.*

Ruth R. Fischbein-Cohen, *for appellant.*

LARRY A. JONES, SR., P.J.:

{¶ 1} In this appeal, defendant-appellant Derrick Dorroh ("Dorroh") challenges the trial court's judgment denying his motion to suppress. For the reasons that follow, we reverse.

**Procedural History**

{¶ 2} Dorroh was charged by way of information with one count each of carrying a concealed weapon and having weapons while under disability. He had a codefendant, Brandon Pritchett ("Pritchett"), who was charged with one count of carrying a concealed weapon. Pritchett and Dorroh filed motions to suppress, and a hearing was held on them.

{¶ 3} At the conclusion of the hearing, the trial court denied their motions. Both defendants entered pleas of no contest to the charges against them. Dorroh was sentenced to five years of community control sanctions. Dorroh now appeals, raising two assignments of error for our review:[1]

> I. It was error to arrest and ultimately indict Derrick Dorroh for any crime, since there was no probable cause to search this appellant.

> II. The testimony of the police was hearsay and inadmissible.

**Facts Adduced from Suppression Hearing**

{¶ 4} On May 7, 2019, the Cleveland police recovered a gun from Dorroh's person; Dorroh did not have a concealed weapon permit. In his suppression motion, Dorroh contended that the stop was reasonable, but the continued detention was impermissibly excessive and the search was unreasonable.[2]

---

[1]Codefendant Pritchett has also filed an appeal, which is pending as a companion to this case. *State v. Pritchett*, 8th Dist. Cuyahoga No. 109149.

[2] The state did not file a brief in opposition to Dorroh's motion. However, it did file a brief in opposition to Pritchett's motion, in which it contended that Pritchett consented to the search by voluntarily, and without having been prompted, handing his backpack to the police; the state maintained that position at the hearing and continued to maintain it in both Pritchett's and Dorroh's appeals.

**{¶ 5}** The facts of this case are adduced from the one witness the state presented at the suppression hearing — Officer Rabee Nasser ("Officer Nasser") — and the documentary evidence derived from Officer Nasser's body camera, which was admitted into evidence.

**{¶ 6}** At approximately 4:00 a.m. on the day in question, Officer Nasser, as well as other officers, responded to a "code 1" call regarding two males who were attempting to break into a PNC Bank ATM at 10900 Lorain Ave., Cleveland, Ohio. A description of both males was given, including that they had backpacks. The officer testified that code 1 is the highest priority call. Officer Nasser was nearby and able to promptly respond. The record shows that Officer Nasser and his partner were the first on the scene, and shortly thereafter two other officers responded as well; thus, there were four officers on the scene.

**{¶ 7}** Upon arriving at the scene, Officer Nasser saw two males — Pritchett and Dorroh — who fit the description that had been given. The police approached the two. They did not have their lights or siren on, and they did not approach with drawn weapons. Officer Nasser said to Pritchett and Dorroh, "Yo, come over here. Let me see some hands"; Pritchett and Dorroh complied without incident. The police asked the defendants if they had any weapons on them, and the defendants indicated that they did not.

{¶ 8} Approximately one minute into the encounter, Officer Nasser said over the police radio that "we're gonna be out with them"; he asked for another officer to check the ATM. The defendants told the police that they had just finished their shift at Taco Bell and went to the ATM to withdraw money. A shirt could be seen hanging out from underneath the "hoodie" Pritchett was wearing, and Pritchett pulled the shirt out even a little more and indicated it was his work shirt. Dorroh gave the officers a sheet of paper, which he told them was his "check out sheet" from Taco Bell, and showed his PNC bank card.

{¶ 9} The police told them that someone called 911 stating that two men had been using tools to try to break into the ATM. The defendants denied that it was them; they maintained that they were simply withdrawing money, and Dorroh said something to the effect of the tipster just "seeing two black men with hoodies" and equating it with suspicion. The police told the defendants that if "everything checks out, y'all [will] be on your way," and it was probably just a "misunderstanding."

{¶ 10} A communication came over the police radio that there were three ATMs in the area and the police out in the field indicated that they would check all three. Shortly thereafter, one of the field officers radioed to the officers on the scene, asking, "Do you have any indicators with those males that you have detained?" Officer Nasser responded, "Negative." Pritchett and Dorroh reiterated to the police that they had just finished their shift at Taco Bell, and had been withdrawing money from the ATM. The police asked if they had a receipt for the transaction, and Dorroh said no, they did not get one. Officer Nasser testified that the lack of a receipt did

not raise suspicion with him; he admitted that he does not always get a receipt when he withdraws money from ATMs. Further, although Dorroh told the police that he had withdrawn $140, the police did not ask him to verify it by showing the money.

{¶ 11} One of the officers asked the defendants if they had their uniforms on. Pritchett responded, "Really?" The officers confirmed that they wanted him to show his uniform; Pritchett complied, taking off his hoodie to show his uniform with the words "Taco Bell" on it. In order to fully show his uniform shirt, Pritchett had to remove his backpack; Officer Nasser testified that he was not "alarmed" and "did not feel threatened" when Pritchett took his backpack off.[3]

{¶ 12} Meanwhile, other police officers were checking area ATMs; as mentioned, there were three in the area, including the one that was the subject of the call. During this time, communication can be heard on the police radio, some of it dealing with other police business, and some of it ostensibly dealing with the matter at hand. At times, it is difficult to hear exactly what is being said over the police radio because the defendants were talking at the same time as the communications; they were compliant with the police, but nonetheless were complaining about the stop and the tipster's call of their alleged "suspicious" activity of withdrawing money.

---

[3]Officer Nasser testified that it was not uncommon for him to do "protective area searches" when dealing with suspects; for example, he testified that he does them sometimes when he pulls people over and has reasonable suspicion they may be armed. But he did not feel the need to do one in this case.

{¶ 13} However, despite the difficulty in hearing all that was being said over the police radio, Officer Nasser testified that a communication came over the radio that there was no damage to any of the three ATMs. Specifically, the officer testified that, "Yes, I did hear that there was no damage to the ATMs because I'm the one who asked to see if there was any damage done to the ATMs." (Tr. 48.) In response to that communication, the police again told the defendants that they would soon "cut you guys loose."

{¶ 14} One of the officers in the group with Pritchett and Dorroh then radioed a sergeant who had apparently been checking the ATMs and asked, "Sarge, any damage to them ATMs?" The response was, "Given this updated information, we'll do a double-check. Just verify that they don't have any tools in their possession." Officer Nasser testified that Pritchett and Dorroh visibly reacted to the statement. Dorroh began to look through his bag; the officer asked him to hand it over and he complied; nothing of significance was found in Dorroh's bag.

{¶ 15} Pritchett questioned the police: "Are we magicians though? Do you gotta see the bag now?" Pritchett started to protest, saying "I'm not gonna * * *," but then turned the bag over. The police then searched Pritchett's bag and found a gun. When asked, Pritchett told them he did not have a carrying concealed weapon permit.

{¶ 16} Pritchett and Dorroh were detained and searched, during which a gun was found in Dorroh's waistband. The defendants maintained that they carried the weapons for their safety. No tools were found in either backpack or on the

defendants' persons, a fact which one of the officers found "strange," but nonetheless confirmed that they (the police) had done the right thing. One of the officers on the scene said, "I know this is not a cut and dry case, but this is — this is like a *Terry* stop. You know, we were just investigating." However, Officer Nasser testified at the hearing that the whole encounter was consensual, and the defendants were free to leave at any time up until their bags were searched.

### The Trial Court's Findings

{¶ 17} The trial court denied Pritchett and Dorroh's motions from the bench, stating the following:

> Okay. I have played the video in my chambers twice to determine what was said, when it was said, and I don't think it's as clear as the defense would like to believe.
>
> I did hear somebody not on scene, over the radio, saying double-check them. I did not hear that all machines were clear and none were damaged. I heard that one was not damaged.
>
> I heard that there were three in that area that they were going to be checking. I never heard that all three were checked in that first eight minutes when they turned over their bags.
>
> I did see Mr. Dorroh — he started to go through his bag on his own. That's when the police officer said, for officers' safety, let me do that. Okay? I hope you all saw that. * * *. So I can — I will rule that searching Mr. Dorroh's bag was definitely allowable.
>
> Mr. Pritchett handed his bag over. Nobody asked him for it. When the officers said to Mr. Dorroh, you understand for officers' safety, let me do that — I think it's for officer's safety, let me do that, you understand, something like that — Mr. Pritchett handed his bag over. He wasn't asked for it.
>
> Whether or not [Pritchett and Dorroh] heard the radio, we don't know. There's been no testimony to that fact that they heard what was on the

radio. What I heard on the radio was, double-check them. One machine was cleared that wasn't damaged to their eye visibly.

That, to me, does not mean the investigation is over because I'm well aware of tampering with ATMs does not always provide visible damage on the outside to the onlooker. But they cleared one machine before the bags were turned over. I did not hear them clear three. So it was still an ongoing investigation.

It was a reasonable suspicion for the stop and once Mr. Dorroh started going through his bag, opening his bag and going through it, there was reasonable suspicion and [for] officer safety, both, to take that bag then and [the officer] do it himself as opposed to letting Mr. Dorroh do it.

If Mr. Dorroh had not opened his bag and started going through it, my opinion may be different; but once he opened his bag and started going through it, there is no way that officer knew what was in that bag and he had to take it from him to do officer safety.

So from that moment on, had that not happened, I would have a different ending to this story, but I have to rule that the search of the bags was permissible under the Fourth Amendment as it occurred in this case.

So your motion to suppress is denied.

## Law and Analysis

### Standard of Review

{¶ 18} A motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When considering a motion to suppress, the trial court assumes the role of trier of fact and is, therefore, in the best position to resolve factual questions and evaluate the credibility of witnesses. *Id.* Consequently, an appellate court must defer to the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* An appellate court, however, must independently determine as a matter of law, without

deference to the trial court's conclusion, whether the facts meet the applicable standard. *State v. Hill*, 8th Dist. Cuyahoga Nos. 83762 and 83775, 2005-Ohio-3155, ¶ 12.

## The Fourth Amendment

**{¶ 19}** In his first assignment of error, Dorroh contends that the search of his person was unconstitutional.

**{¶ 20}** The Fourth Amendment to the United States Constitution and Article I, Section 14, of the Ohio State Constitution protect against unreasonable governmental searches and seizures. *State v. Callan*, 8th Dist. Cuyahoga No. 95310, 2011-Ohio-2279, ¶ 15. Warrantless searches and seizures are considered per se unreasonable, unless an exception to the warrant requirement applies. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**{¶ 21}** An investigative stop, or "*Terry* stop," is a common exception to the Fourth Amendment warrant requirement. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A *Terry* stop is a temporary detention of a person for the limited purpose of either conducting a pat-down of the outer clothing of a person suspected of being armed and dangerous, or investigating suspected criminal behavior. *Id.* at ¶ 24. While a *Terry* stop constitutes a seizure, it does not violate the Fourth Amendment as long as the officer has reasonable suspicion based on articulable facts that a person has committed or is about to commit a crime. *State v. Aufrance*, 2d Dist. Montgomery No. 21870, 2007-Ohio-2415, ¶ 14, citing *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

{¶ 22} If an officer temporarily detains a person without reasonable suspicion, then a Fourth Amendment violation has occurred. *Aufrance* at *id.* If evidence is obtained as a result of an illegal Fourth Amendment search or seizure, the exclusionary rule bars that evidence from being used against a defendant at trial. *Murray v. United States*, 487 U.S. 533, 536, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

{¶ 23} The United States Supreme Court has held, however, that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry* at fn. 16. A person is not seized within the meaning of the Fourth Amendment if the police merely engage a person in a consensual encounter.

{¶ 24} A consensual encounter is a manner of contact initiated by a police officer for purposes of inquiry only. Consensual encounters do not require that a police officer have a reasonable suspicion of criminal activity before making the approach. *State v. Patterson*, 9th Dist. Summit No. 23135, 2006-Ohio-5424, ¶ 18, citing *Cuyahoga Falls v. Sandstrom*, 9th Dist. Summit No. 17000, 1995 Ohio App. LEXIS 2624 (June 21, 1995). "[M]erely approaching an individual on the street or in another public place[,]" for the purpose of asking questions that elicit voluntary, uncoerced responses, does not violate the Fourth Amendment. *State v. Boswell*, 5th Dist. Ashland No. 13-COA-018, 2014-Ohio-886, ¶ 14, citing *United States v. Flowers*, 909 F.2d 145 (6th Cir.1990). A person approached in this manner is not required to answer any question, and may choose to end the interaction at any point or decline to engage in the interaction altogether. *Boswell* at ¶ 11.

{¶ 25} In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the United States Supreme Court listed factors to consider when determining whether an individual is engaged in a consensual encounter as opposed to an investigatory detention by police. The factors include, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554. The relevant inquiry is whether, when looking at the totality of the circumstances, a reasonable person under the same circumstances would feel free to leave and end the encounter with the police. *Id.*

{¶ 26} If, however, the police initiate a lawful *Terry* stop, they must be careful not to exceed the scope of the stop's "underlying justification." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Additionally, the length of the stop cannot last "longer than is necessary to effectuate the purpose of the stop." *Id.*

{¶ 27} As mentioned, Dorroh did not challenge the initial stop at the trial-court level; in his suppression motion, he conceded that the police "initially made a reasonable stop." However, in his appeal before this court, Dorroh makes seemingly fleeting challenges to the initial stop in his first assignment of error and outright challenges it in his second assignment of error. For example, in his argument in his first assignment of error he states that at the time police stopped him he "was walking peacefully with his friend," as a "mere citizen * * * where the police

happened to come by." Because Dorroh did not challenge the initial stop at the trial-court level (but actually admitted it was permissible), we summarily overrule any challenge to it here.

{¶ 28} In regard to the state's contention that the encounter with the defendants was consensual, the trial court did not acquiesce to that contention; rather, the court found that there "was a reasonable suspicion for the stop," a finding that would not be made unless there was a *Terry* stop. The trial court's finding that a seizure had occurred was supported by competent, credible evidence in the record.

{¶ 29} Specifically, the police approached Pritchett and Dorroh saying, "Yo, come over here. Let me see some hands." The police told the two that 'if everything checked out" they would be released — a clear implication that they were not free to leave. The police repeated that their release was conditioned on the defendants showing them their backpacks. These facts were competent, credible evidence that the defendants had been seized.

{¶ 30} But, upon review, other findings made by the trial court were not supported by competent, credible evidence. First, the trial court found that the continued detention of the defendants was permissible because the information the police had on the scene was that only one ATM had been cleared. As there were two other ATMs in the area, the court reasoned that the investigation was ongoing. As mentioned, it was hard at times to hear what was being communicated over the police radio. But Officer Nasser testified that the police on the scene were told that

all three ATMs had been cleared. After that clearance was given, the police were instructed to "double-check" the defendants for "tools."

{¶ 31} In light of the above, the trial court's finding that only one machine had been cleared and the investigation was ongoing was not supported by competent, credible evidence in the record.

{¶ 32} Second, the trial court found that the search of Dorroh's bag was permissible because Dorroh opened it and started going through it himself. On that point, the court stated that if Dorroh "had not opened his bag and started going through it, my opinion may be different." What the trial court's analysis missed though is that Dorroh only started looking through his bag in response to hearing the command over the police radio to search the defendants' bags to see if they had any tools in their possession. We find that at that time, the purpose of the stop was over — that is, all three ATMs had been cleared and there was no other suspicious circumstance on which the defendants could be further detained. Despite that, the police conditioned the defendants' ability to leave was on their bags being searched. Thus, the trial court's finding that the defendants "turned over their bags" and insinuation that Dorroh just randomly started going through his bag is not supported by competent, credible evidence.

{¶ 33} Third, the trial court found that there was "no way to know" whether the defendants heard the sergeant's directive to the police on the scene to "Just verify that they don't have any tools in their possession." Officer Nasser testified "I'm very certain that they heard the sergeant because as soon as the sergeant said it, you could

tell by their expression * * *." As such, the trial court's finding in this regard was not supported by competent, credible evidence.

{¶ 34} Because we find that the trial court made findings not supported by competent, credible evidence, we likewise find its conclusions were not constitutionally sound. The trial court's finding that there was an ongoing investigation is erroneous; we find that the detention of Dorroh exceeded its lawful duration and scope. The record demonstrates that the purpose of the stop was to investigate two men who allegedly were seen using tools to break into an ATM machine. That ATM, along with two others in the area was cleared — there were no indicators that any of the three had been tampered with. Further, there were no on-the-scene "indicators" with either Pritchett or Dorroh that gave rise to suspicion. On this record, the stop was impermissibly extended so that the scope of the investigation could be expanded without any reasonable basis.

{¶ 35} Thus, at the point in the detention when the police requested the defendants' backpacks, the investigation prompted by the 911 call was over; that is, there was no evidence that any of the ATMs had been tampered with. There was no reasonable suspicion that either defendant was armed and dangerous. But for the police's unconstitutional search of Pritchett's backpack, the police would not have searched Dorroh's person.

{¶ 36} On the record before us, the search of the defendants' bags — as evidenced by the sergeant's command to "double-check" and "verify" that the defendants did not have any tools in their possession — was a fishing expedition.

Indeed, "double-check" implies that "everything is okay," but "let's make sure." In the realm of Fourth Amendment analysis, and on this record (i.e., aside from fitting the description of the suspects, there was nothing suspicious about the defendants, they were compliant, and it was not a consensual encounter) "double- check" and "let's make sure" equate to an impermissibly prolonged stop.

{¶ 37} Based on the above, the gun found on Dorroh's person, and his admission that he did not have a license, was unconstitutionally obtained. We therefore sustain the first assignment of error.

## The Stop: Anonymous Tip

{¶ 38} In Dorroh's second assignment of error, he contends that the anonymous tip given to the police that led to him and Pritchett being stopped was hearsay and, therefore, unreliable.

{¶ 39} However, as mentioned, Dorroh conceded at the trial-court level that the stop was permissible and, thus, did not challenge it. It is well-established that arguments raised for the first time on appeal are generally barred and a reviewing court will not consider issues that the appellant failed to raise in the trial court. *Cawley JV, L.L.C. v. Wall St. Recycling L.L.C.*, 2015-Ohio-1846, 35 N.E.3d 30, ¶ 17 (8th Dist.); *Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975). As this court stated in *Orefice v. Orefice*, 8th Dist. Cuyahoga No. 70602 1996 Ohio App. LEXIS 5752 (Dec. 19, 1996):

> It is fundamental to appellate review that issues not presented to the trial court may not be initially reviewed on appeal, such that a party may not assert new legal theories for the first time before the appellate

court.  *Kleinfeld v. Link* (1983), 9 Ohio App.3d 29, 9 Ohio B. 30, 457 N.E.2d 1187; *AMF, Inc. v. Mravec* (1981), 2 Ohio App.3d 29, 2 Ohio B. 32, 440 N.E.2d 600.

*Orefice* at 12.

**{¶ 40}** Indeed, "'[s]uch arguments are barred by the doctrine of waiver for failure to raise these arguments before the trial court.'" *Cawley JV* at *id.*, quoting *Hollish v. Maners*, 5th Dist. Knox No. 2011CA000005, 2011-Ohio-4823, ¶ 44, quoting *Carrico v. Drake Constr.*, 5th Dist. Stark No. 2005CA00201, 2006-Ohio-3138, ¶ 37.

**{¶ 41}** Therefore, in light of the above, Dorroh waived his argument about the stop.  He cannot now argue, for the first time on appeal, that the anonymous tip was unreliable.  The second assignment of error is overruled.

## Conclusion

**{¶ 42}** Although Dorroh waived the right to challenge the initial stop, as set forth in his second assignment of error, we find merit to his challenge regarding the search of his person and, therefore, sustain the first assignment of error and reverse the judgment denying his motion to suppress.

**{¶ 43}** Judgment reversed.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., PRESIDING JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
MICHELLE J. SHEEHAN, J., DISSENTS
WITH SEPARATE DISSENTING OPINION

MICHELLE J. SHEEHAN, J., DISSENTING:

{¶ 44} I respectfully dissent from the majority opinion. I find that the trial court's determination that the police investigation was ongoing at the time the backpacks were searched was based on competent, credible evidence. Because the investigation was not over or unreasonably prolonged, I would find that the pat-down of Dorroh was proper.

{¶ 45} From the time Officer Nasser and others stopped Pritchett and Dorroh, Officer Nasser was in radio communication with his supervisor. He learned that other units were in the area checking nearby ATMs. At approximately seven minutes into the stop, the unit checking the ATMs reported that there was no visible damage to the ATM at the PNC bank that was the subject of the 911 call. However, dispatch had contacted the 911 caller and at approximately eight minutes into the stop, the dispatcher reported the 911 caller provided more specific information that the ATM was being tampered with by using a tool on the ATM money release section. At approximately nine minutes into the stop, the supervising officer stated that given

that new information, officers were to further "double-check" the ATMs. After that, he told the officers with Pritchett and Dorroh to verify they did not have any tools.

{¶ 46} After hearing the evidence and reviewing the body cam, the trial court found that the investigation was not completed, specifically noting that the ATMs had not been cleared. As such, I would not disturb the trial court's determination that the reason for the investigative stop was not over or prolonged when Officer Nasser's supervisor broadcast to him and his partner to verify Pritchett and Dorroh didn't have any tools while other officers were going to re-check the ATMs.

{¶ 47} After that broadcast, Pritchett questioned the officers about his backpack being checked and objected to handing it over, but Dorroh opened his backpack and started to search inside it. Officer Nasser immediately asked to look at Dorroh's backpack himself for safety, and Dorroh handed him the backpack. As Officer Nasser was checking Dorroh's backpack, a loaded firearm was found in Pritchett's backpack. This discovery changed the nature of the encounter. Dorroh was then patted down and a loaded weapon was discovered in his waistband. Officer Nasser testified that he was concerned for his and his fellow officer's safety:

> In this particular situation, there's a firearm involved. Firearms are dangerous. So, you know, we're looking at officers' safety. We're looking at everybody's safety at this point. And, you know, my partner decided that it's best for everybody's safety, again, you know, to pat them down and make sure he doesn't have any weapons on him.

{¶ 48} Given the time of night, the circumstances of the encounter, and the fact that Dorroh's brother, Pritchett, was carrying a loaded firearm, I would find that the pat-down of Dorroh was reasonable under the totality of the circumstances and

in accord with the guidelines set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), as well as our prior holdings.

{¶ 49} The so-called "automatic companion" rule is a rule that allows the police to pat down any companion of an arrestee to give assurance that they are unarmed. *See, e.g., State v. Barlow*, 8th Dist. Cuyahoga No. 53378, 1988 Ohio App. LEXIS 124 (Jan. 21, 1988); *see also United States v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir.1971) ("all companions of the arrestee within the immediate vicinity * * * are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed"). *In re D.S.*, 2013-Ohio-5740, 5 N.E.3d 1063, ¶ 14 (8th Dist.).

{¶ 50} I do not agree with the majority opinion finding that the purpose of the investigation was over when the backpacks were searched or that the investigation was unreasonably prolonged. New information was received and the ATMs had not been rechecked in light of that information. The law does not permit an unconstitutional search of Pritchett's bag to taint the search of Dorroh's person. Only Pritchett has standing to contest the search of his backpack; Dorroh does not.

{¶ 51} "It is fundamental that a defendant have standing to challenge the legality of a search or seizure." *State v. Williams*, 73 Ohio St.3d 153, 166, 652 N.E.2d 721 (1995). This court has further found that a defendant cannot assert another's Fourth Amendment right. *State v. Smith*, 117 Ohio App.3d 656, 667, 691 N.E.2d 324 (8th Dist.1997), quoting *State v. Steele*, 2 Ohio App.3d 105, 107, 440 N.E.2d 1353

(8th Dist.1981) ("The Fourth Amendment right to be free from unreasonable searches and seizures cannot be vicariously asserted.").

{¶ 52} Because the law does not provide Dorroh with standing to complain about the search of Pritchett's backpack, he cannot have the evidence of Pritchett's gun suppressed. Once Pritchett's gun was found, the police had probable cause to search Dorroh and the trial court properly denied Dorroh's motion to suppress.